ILLINOIS POWER COMPANY, Appellant, v. THE INDUSTRIAL COM-
MISSION *et al.* (Charles Simcox, Appellee).

Fourth District (Industrial Commission Division)   No. 4—87—0055WC

Opinion filed November 3, 1988.—Rehearing denied December 14, 1988.

McCULLOUGH and McNAMARA, JJ., dissenting.

Thomas D. Nyhan and William A. Morgan, both of Pope, Ballard, Shepard & Fowle, Ltd., of Chicago, for appellant.

Verticchio & Verticchio, of Gillespie, for appellee.

JUSTICE BARRY delivered the opinion of the court:

The petitioner, Charles Simcox, sought benefits under both the Workmen's (now Workers') Compensation Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.1 *et seq.*) and the Worker's Occupational Diseases Act (Ill. Rev. Stat. 1977, ch. 48, par. 172.36 *et seq.*) for exacerbation of a coronary disorder due to trauma, coronary artery disease and other

injuries sustained while he was employed by the respondent, Illinois Power Company (the Company). Adjudicating all issues pursuant to the Workmen's Compensation Act, the arbitrator found it uncontroverted that the accident occurred, that it arose out of and in the course of employment and that there was no causal connection or permanent disability, and she denied the petitioner's claim. The Industrial Commission affirmed, but the circuit court of Macoupin County reversed and remanded the cause to the Commission to determine compensation. The Company's appeal from that decision was dismissed for lack of a final order. Upon remand the Commission rendered a total and permanent award. On January 14, 1987, the circuit court confirmed the award, and the respondent again appeals to this court.

In 1947 the petitioner began to work for the Company as an electrical lineman. Five years later he was promoted to line crew foreman. In September of 1975 the petitioner suffered a nonwork-related acute, but mild, inferior wall myocardial infarction. He was treated conservatively. The following April he resumed his supervisory position, which involved inspecting work orders, assigning jobs, ordering materials, making materials and equipment accessible to his crew, keeping time sheets and other records, collecting data from transformers, occasionally climbing with his crew, digging holes, framing poles and crossarms and operating equipment. Between April of 1976 and August 22, 1977, the petitioner felt good and seemed healthy. On August 22, 1977, the then 59-year-old petitioner and his crew completed two underground service jobs and proceeded to the pole yard to unload a shipment of poles, some of which had shifted forward against the flatbed trailer's steel, horseshoe-shaped, bulkhead. After removing some poles, the crew attempted to pry the bulkhead loose with crowbars and a metal sling attached to a winch line. The petitioner was standing on the truck's "belly" gas tank. Suddenly the bulkhead detached, struck the petitioner's left hip and chest, and propelled him through the air some 26 feet to the ground. He landed primarily on his heels and left hand.

The following morning the petitioner consulted his local general practitioner, Dr. Marciukaitis, but then returned to the Company office to do paper work the remainder of the week. On the weekend the petitioner's chest and shoulder pains suddenly intensified when he was working at home on his washing machine. On August 29, Dr. Marciukaitis hospitalized the petitioner in the local hospital's intensive coronary care unit for pain in the heart region radiating to the left shoulder, left arm and back. The petitioner exhibited a shortness

of breath and persistent pain in his hand, arm, and heels.

Several days later the petitioner transferred to Barnes Hospital in St. Louis, Missouri, where he consulted daily with Dr. Edward Massie, a board-certified specialist in cardiology and cardiovascular diseases. Then to alleviate high grade obstructions in the petitioner's left anterior descending coronary artery and his right coronary artery, Dr. Massie referred him for double coronary bypass surgery. That was performed on September 21, 1977. The petitioner continued to see Dr. Massie thereafter. Dr. Massie detected no further deterioration or permanent heart damage, but observed that the petitioner's coronary artery disease and chest tenderness persisted.

The issues presented for our review are: (1) Whether the circuit court improperly substituted its judgment for that of the Industrial Commission, and (2) whether there is sufficient evidence to support an award of total permanent disability under section 8(f) of the Workmen's Compensation Act of Illinois (Ill. Rev. Stat. 1977, ch. 48, par. 138.8(f)).

Because we are concerned primarily with the petitioner's coronary disorder and how it may have been affected by the incident of August 22, 1977, we will now detail the evidence depositions of board-certified attending cardiologist Dr. Massie and the respondent's board-certified cardiologist, Dr. Scherlis. Neither doctor testified before the arbitrator or the Commission.

It was the opinion of Dr. Massie that the petitioner's condition was not directly related to his 1975 infarction. Instead, Dr. Massie concluded that the August 22, 1977, accident precipitated total disability by exacerbating the petitioner's coronary artery disease and by directly affecting the condition of his heart. The doctor further opined that the petitioner's left peri-nipple area chest pains were anginal as well as due to trauma, and that physical exertion could have precipitated the petitioner's complaints. Further he specifically indicated that such a harrowing experience could aggravate the petitioner's arteriosclerotic disease and produce anginal pain, as would excitement, consternation, apprehension and argumentation. He said that upon surgical intervention performed within a month of the accident it was found that the petitioner had fortunately developed good collateral circulation about his heart subsequent to his 1975 myocardial infarction. Dr. Massie also verified that the onset of symptoms following the precipitating factor can be delayed.

Dr. Scherlis did not examine the petitioner. He based his opinion on the petitioner's medical records. In his deposition Scherlis stated that arteriosclerosis is not caused by trauma and concluded as fol-

lows: Arteriosclerotic heart disease caused blockage in at least one of the petitioner's blood vessels and resulted in his 1975 infarction; thereafter, he improved, stabilized, experienced occasional angina and again developed progressive hardening of the arteries; the external trauma of August 22, 1977, neither caused nor worsened the petitioner's disease; on August 27 when the petitioner worked on a washing machine "he experienced angina, discomfort due to the heart's increased work demand and inadequate coronary blood supply"; no further damage to the petitioner's heart muscle was detected thereafter, but subsequently, due to hardening and accumulations, two of the petitioner's major coronary arteries were obstructed; in 1979, the petitioner's coronary artery disease persisted.

Dr. Scherlis further opined that there was no causal connection between the accident and subsequent occurrences with the petitioner's heart, as no medical evidence indicated that the petitioner's coronary condition was attributable to or worsened by the accident. He added that the gradual coronary sclerotic process could have caused the blockage as well as the exacerbations and remissions in the petitioner's condition.

It is undisputed that this petitioner suffered arteriosclerosis. It also appears undisputed by the medical witnesses that the onset of the disease here was not caused by trauma. However, neither of the foregoing is of particular concern here. The determinative question is whether this petitioner's experience of August 22, 1977, aggravated his coronary disease.

The petitioner suffered an acute, but apparently mild, myocardial infarction in 1975. He quit smoking, was treated with medication and a light exercise program, and was able to return to his physically active job about six months later. Except for one reading, his blood pressure was within low normal limits. He worked without interruption and without any ill-feeling for about a year and a half, until August 22, 1977. Nitroglycerine was prescribed for any anginal pain he might encounter. He denied having had to use any nitroglycerine after his return to work. It appears, however, that Dr. Scherlis, for his opinion testimony, assumed that the petitioner did use nitroglycerine from time to time during this period.

The petitioner further testified that his job as a crew foreman was a responsible one and that it called for some rather substantial physical exertion. He said he performed the exact same duties after the 1975 myocardial infarction as before and then went on to describe the accident of August 22, 1977. A co-worker and eyewitness,

Charles Folkers, verified all of this testimony by the petitioner. Petitioner testified that he was dazed and sore as he picked himself up off the ground, his trousers were torn from the left hip area to the top of his left boot, his left hip and buttocks were cut and scratched, his hand was swollen. He sensed pain in his left arm and shoulder also. He said he told the crew to proceed while he rested and rendered some first aid to himself. He finished the day at the Company warehouse, and then went home, took a sleeping pill and went to bed. The next morning he reported the incident and the local Company manager authorized him to go to his family doctor. After X rays were taken at the local area hospital at Litchfield, he returned to the Company office and finished the week, by his choice, at the Company plant, doing paper work. Because the injured areas became more painful, he was admitted to the Litchfield hospital on the following Monday. He was put in intensive care and became bilious when he tried to eat. He remained in intensive care for about the first four days under the care of Dr. Marciukaitis and Dr. Villegas, in consultation, as was the case when he suffered the myocardial infarction in 1975. He was complaining of chest pain through his back and a sore hand, shoulder, arm and heels. He said he performed no work about his house that prior weekend.

Dr. Massie testified that upon admission to St. Francis Hospital in Litchfield, Illinois, on August 29, 1977, petitioner complained of pain in the heart region radiating to the left shoulder, left arm and back. The diagnosis was coronary disease. He underwent cardiac catheterization and cardioangiographic study on September 13, 1977, at Barnes Hospital, where the findings indicated a very high grade obstruction in the left anterior descending coronary artery and in the right artery. Bypass heart surgery followed.

Pertinent questions to Dr. Massie and his answers on both direct and cross-examination follow:

"Q. *** [D]o you have an opinion within a reasonable degree of medical certainty whether Mr. Simcox's physical condition *** [on] September 2, 1977, was related to his past medical history, particularly inferior myocardial infarction in 1975?
\* \* \*

A. Yes. From the time I saw this patient initially I would say the problems were not related directly to the inferior myocardial infarction in the past—because that occurred. But I would indicate that the subsequent events did exacerbate his coronary artery problem, and very possibly the accident which involved trauma to the chest could have contributed to the

heart by virtue of a contusion as the same time.

\* \* \*

Q. Doctor, based on those same facts that we have here do you have an opinion within a reasonable degree of medical certainty whether Mr. Simcox's heart disorder, or damage, as existing prior to August 22, 1977, was affected by the blow or fall he sustained while working for Illinois Power Company on August 22, 1977?

A. I do have an opinion.

Q. What is that?

A. The opinion is that the blow had a direct effect of a deteriorating nature on his heart condition as a result of the accident.

Q. On what do you base that \*\*\*, Doctor?

A. I base it on the fact that, as stated before, he had a very good recovery. He was asymptomatic. He worked for a certain number of months very successfully and then suddenly with the accident, precipitously, he became worse.

Q. Doctor, based on these same facts do you have an opinion within a reasonable degree of medical certainty whether the blow and the fall sustained by Mr. Simcox on August 22, 1977, was the proximate cause and contributing to, or precipitating, Mr. Simcox's present physical condition, particularly any heart disorder?

A. Yes, I have an opinion.

Q. What is that opinion?

A. That it was a precipitating episode for worsening of his heart condition.

Q. And do you have an opinion as to whether that worsening has rendered him totally and permanently disabled for employment?

A. Yes, I definitely do, because it did contribute and cause his state of total disability for employment.

Q. Doctor, considering the facts here and previously set out, do you have an opinion within a reasonable degree of medical certainty whether the blow or fall sustained by Mr. Simcox on August 22, 1977, was the proximate cause contributing to, or precipitating, aggravation of any pre-existing coronary disorder of Mr. Simcox?

\* \* \*

A. Yes, I feel that it did aggravate the pre-existing condition."

Dr. Massie continued that the accident was the proximate cause for the hospitalizations in Litchfield and at Barnes Hospital. He also stated that there was a normal, good recovery following the 1975 infarction, but that the course of that recovery was suddenly changed in a deteriorating fashion by the accident, and that the accident trauma exacerbated or flared up the petitioner's preexisting condition. The doctor repeated that the petitioner was thus rendered totally and permanently disabled for his employment.

With regard to the medical opinions with which we are specially concerned, Dr. Scherlis, upon being deposed, answered that he had reviewed all of the petitioner's medical records subsequent to the accident which verified that the petitioner did not suffer a myocardial infarction as a result of the accident. He said he agreed with the hospital record, which indicated that the petitioner was suffering from coronary heart disease and angina, and that the unchanged electrocardiograms taken in 1975 and 1977 meant that there was no myocardial infarction after 1975. Dr. Scherlis agrees with Dr. Massie in this regard.

Questions then put to Dr. Scherlis and his answers follow:

"Q. Now, Doctor, after reviewing the St. Francis Hospital [Litchfield] record of September [sic] of 1977 and the Barnes Hospital record of September of 1977, what if any evidence is there in those records of a contusion injury to the heart?

A. None.

Q. Was there any suggestion made by any physician on the case either at the hospital in Litchfield or Barnes, that there was a contusion injury to the heart?

A. No, there was no conclusion by any of those who saw him that there was a basis for a diagnosis of contusion of the heart. None of the final discharge diagnoses listed that."

Dr. Scherlis was next asked hypothetically whether in his opinion after reviewing all of the records treatment at the Litchfield and Barnes Hospitals was necessitated by the accident. He answered, "I think my opinion is there is no causal relationship between the accident and the subsequent events with regard [sic] his heart." He further stated, "I don't think there is any evidence of any worsening of this coronary condition that could be attributed to the accident."

Dr. Scherlis' deposition continued:

"Q. I will ask you the next question then just to be sure I have this in the record, Doctor. Do you have an opinion based upon a reasonable degree of medical and surgical certainty whether or not that condition for which he was treated as be-

fore described was in any way aggravated by the accident of August 22, 1977?

A. Aggravated is a very vague term. What do you mean?

Q. Well, was that condition, was the underlying condition of arteriosclerosis made worse by that accident of August 22, 1977?

A. No, it was not.

Q. And what do you base that opinion on, Doctor?

A. On the lack of any evidence to show that it was worsened as a result.

* * *

Q. Doctor, do you concur in Dr. Massie's opinion that the blow, presumably a blow resulting from [*sic*] the injury, the accident on August 22, 1977, had a direct effect of a deteriorating nature on his heart condition?

A. Do you mean the blow to whatever part of the body described as having occurred?

Q. Yes.

A. I don't know what you mean by deteriorating nature. Again, it is a vague term. But if you mean is there any evidence that the blows to any part of the body caused a worsening of his coronary heart disease, the answer is no."

Dr. Scherlis stated that any opinions he expressed were based upon his medical experience and training as well as his examination of the records and the objective findings of others who examined the petitioner. Dr. Scherlis further responded that he knew Dr. Massie as a good cardiologist, but that he does not agree with everything that Dr. Massie says or does.

The deposition continued:

"Q. Doctor, you mentioned during your direct examination collateral circulation. In examining your records and examining the various exhibits, are you aware of the fact that Dr. Massie stated that there was a good collateral circulation in Mr. Simcox?

A. I would like to see the statement.

Q. Part of two pages, the last line on 56 and the top of 57.

A. Now, what is your question?

Q. Are you aware of the fact that Dr. Massie stated that this person had a good collateral circulation?

A. I am aware of the fact that on page 56 of his deposition Dr. Massie stated that he was fortunate to have had some good collateral circulation prior to the time he saw him. And

he is referring to after the recovery from the initial episode of 1975, obviously, because if he had good collateral circulation in 1977 they wouldn't have done a bypass surgery. So he assumes, as most of us assume, that if you got over a coronary you have some collateral circulation. But it depends [on] where and *** what you are talking about. In other words, he did not have adequate coronary circulation to prevent scarring of the heart muscle to such an extent that when they studied him prior to the coronary bypass the whole inferior surface of the heart didn't contract. That was a big scar, which meant that collateral circulation was grossly inadequate in that area. And that is an area that was supplied by probably the right coronary artery which was demonstrated to be occluded in 1977. And they did the angiogram in '77. He had occlusion of another major coronary artery which had not resulted in infarction of that part of the heart muscle but which was in all probability responsible for his symptoms because they did the bypass to bypass that area. So all you can say is he had enough that he didn't die after the heart attack in 1975.

Q. And he had enough that in April of '76 he went back to work?

A. Yes, of course, but as Dr. Massie correctly points out, coronary sclerosis is a gradually developing thing. And the same process that caused the myocardial infarction and coronary occlusion in 1975 was still operating in 1975, in 1976, 1977, and was also operating in 1978 and 1979, perhaps responsible for the blockage of the bypasses.

Q. Doctor,—

A. So that this was a gradually progressing condition, as I testified initially, with exacerbation and remissions, which is the nature of the beast.

\* \* \*

Q. Well, assuming that he didn't take the nitroglycerine tablets, then would you say that he didn't have occasional angina?

A. What actually happened was that he was stable during that period with occasional angina and being very tired after exercise tests, and then he had this accident in which he was involved. He went into the hospital after the accident and they decided that while he was there they may as well look and see if he has treatable coronary disease. And they looked and he had two-vessel disease, old-standing blockage of two coronary

arteries, and that is why they operated upon him.

Q. And your opinion is based on that statement you just made?

A. My opinion is based on everything that I looked at in this case.

\* \* \*

Q. Assuming that he did not take nitroglycerine tablets after May of 1976, would you say that his condition was stabilized?

A. His clinical manifestations were stabilized. But he was developing the same progressive hardening of the arteries which resulted in the original coronary occlusion or myocardial infarction in 1975. But the fact that you have a heart attack and recover does not protect you from subsequent heart attacks. It means that you are more likely to have a subsequent heart attack than somebody that hasn't had one.

Q. But from August 22 and thereafter of 1977, this stabilized condition changed a pattern, did it not?

A. After August 22, he had chest pains due to chest wall involvement and he [sic] tenderness over the chest.

Q. Thank you, that answered the question."

We have purposefully quoted a substantial portion of the approximately 200 pages of the cardiologists' depositions for what we believe is good reason. Neither the arbitrator nor the Commission (the latter on two occasions), in their opinions and decisions, has referred to the opinions of the cardiologists, save only the following: "The Arbitrator also adopts Respondent's Exhibit No. 4, the evidence deposition of Dr. Sidney Scherlis." It is obvious that the arbitrator reviewed the expert testimony. That the Commission considered the entire record is not equally obvious.

■ It is axiomatic that the Commission resolves factual disputes, draws reasonable inferences and conclusions from the evidence, determines causal connection, decides which conflicting medical view to accept, and determines whether an injury aggravated a preexisting condition. Thus, the Commission decides whether to attribute a petitioner's disability to a degenerative condition or to an industrial accident's aggravation of a preexisting condition. (*Material Service Corp. v. Industrial Comm'n* (1983), 97 Ill. 2d 382, 454 N.E.2d 655.) This court will not reverse those determinations, unless they are contrary to the manifest weight of the evidence. (See *Caterpillar Tractor Co. v. Industrial Comm'n* (1982), 92 Ill. 2d 30, 440 N.E.2d 861.) And, an aggravation that arises out of and in the

course of employment is compensable unless prior to the accident the petitioner's health had so deteriorated that any normal activity could have aggravated his condition (*Peoria Motors, Inc. v. Industrial Comm'n* (1982), 92 Ill. 2d 260, 442 N.E.2d 144) or his work activity presented risks no greater than those to which the general public is exposed. (*Caterpillar Tractor Co.* (1982), 92 Ill. 2d 30, 440 N.E.2d 861.) Thus, some act or phase of employment must have been a causative factor in the ensuing injury. (*Interlake, Inc. v. Industrial Comm'n* (1981), 86 Ill. 2d 168, 427 N.E.2d 103.) But, proof of prior good health and change immediately following and continuing after an injury may establish that an impaired condition was due to the injury. *Spector Freight Systems, Inc. v. Industrial Comm'n* (1983), 93 Ill. 2d 507, 455 N.E.2d 280.

Here, as aforesaid, Dr. Massie, the attending cardiologist, concluded that the trauma had caused the petitioner's renewed onset of anginal chest pains and that the accident had precipitated total permanent disability by exacerbating or aggravating the petitioner's coronary artery disease. Cardiologist Dr. Scherlis, who was engaged by the employer and who never examined the petitioner, but simply reviewed the petitioner's medical records, premised his deposition testimony on his general belief that the arteriosclerosis could not be caused by external bodily trauma and concluded that the petitioner's resultant condition of ill-being could not have been caused by the accident. Both doctors agreed that the only evidence of a myocardial infarction was that experienced in 1975 and that there was no documentation of a possible contusion of the heart.

Further, as referred to above, Dr. Scherlis, when asked whether the petitioner's post-accident condition was in any way caused by the accident, unequivocally responded, "There is no causal relationship between the accident and the subsequent events with regard to his heart." He stated that he found no evidence that the petitioner's worsened coronary condition could be attributed to the accident. Then, when asked whether the condition for which the petitioner was treated was in any way aggravated by the accident, he replied, "Aggravation is a very vague term." He then stated that he based his lack of causation finding on his belief that the underlying arteriosclerosis was not made worse by the accident. When asked whether the accident "had a direct effect of a deteriorating nature on [the petitioner's] heart condition," Dr. Scherlis replied, "I don't know what you mean by deteriorating nature. Again, it is a vague term." Thereafter, on cross-examination the following exchange occurred between the petitioner's attorney and Dr. Scherlis:

"[ATTORNEY]: A blow in the chest area on a person with a coronary infarction may affect one person differently than another; is that correct?

DOCTOR [Scherlis]: What type of blow? Where is the chest area? Because your question is very vague, you see."

Similarly:

"[ATTORNEY]: Doctor, if a person has a myocardial infarction as described in these records, can a trauma to the chest area so agitate the person to cause a deterioration of the condition?

DOCTOR: What do you mean by a deterioration?"

When the petitioner's attorney again questioned Dr. Scherlis about aggravation, the following colloquy occurred:

"[ATTORNEY]: As to the development—as to aggravating an existing heart condition, particularly a myocardial infarction?

DOCTOR: What do you mean by aggravation? That is one of the loose terms that was used in other opinions which you quoted which I'd rather you define.

[ATTORNEY]: Worsening, making it worse than it is.

DOCTOR: What worse? A myocardial infarction, coronary occlusion?

[ATTORNEY]: The well-being of the body?

DOCTOR: You mean if somebody hurts his ankle does it hurt the well being of the body because he is uncomfortable? I am trying to understand what you are talking about.

[ATTORNEY]: Doctor, does trauma to the chest area—can it or may it cause an aggravation to an existing myocardial infarction?

DOCTOR: What do you mean by aggravation?

[ATTORNEY]: You can't answer the question?

DOCTOR: If you want to be specific, can trauma to the chest produce myocardial contusion? Yes. In this case there is no evidence that it did so.

[ATTORNEY]: I didn't ask myocardial contusion, I asked you can it or may it cause an aggravation of a myocardial infarction?

DOCTOR: Well, again, aggravation is a non-medical, nonspecific term which is not used except incorrectly for the most part, and I'd like you to use a more specific term and I will give you a specific answer.

[ATTORNEY]: The record may show the question and the

answer. Doctor, do you have an opinion as to whether an existing myocardial infarction can be aggravated?

DOCTOR: I have an opinion that aggravation is such a loose term, if you will give me the scientific or precise or accurate term that cannot be misinterpreted, I will be glad to answer the question."

We find that despite his expertise Dr. Scherlis deliberately refused to answer pertinent questions regarding causal connection. He thus failed to substantiate his determination that there was no causal relationship between the accident and subsequent coronary events. He also professed ignorance of medical concepts critical to that determination—*e.g.*, aggravation, deteriorating nature, the effect of a blow to the chest—even though he did testify on direct examination to "no worsening."

■ "Aggravation" is a specific, nongeneric medicolegal concept inherent to claims for workers' compensation in this State. It must be addressed in any case involving a preexisting condition of ill-being. Given the instant petitioner's forceful trauma, we are disturbed by the fact that Dr. Scherlis was needlessly evasive upon the issue of whether trauma aggravated the petitioner's coronary condition. Dr. Scherlis considered himself an advocate of the truth, yet he deliberately refused to substantiate his disagreement with Dr. Massie's conclusion that the accident was causally related to the petitioner's subsequent coronary problems. It is noteworthy that Dr. Scherlis never indicated that a trauma-induced heart injury could *not* occur.

■ Under these circumstances we find that the Commission erred in adopting the deposition of Dr. Scherlis, which was inconclusive on the crucial issue of "aggravation." In fact, Dr. Scherlis refused to express an opinion as to whether or not "aggravation" occurred, because he thought the term too vague. Dr. Massie provided the only medical evidence as to the absence or presence of "aggravation." Dr. Massie's medical evidence that aggravation occurred mandates a reversal of the Commission.

■ Consequently, we need to determine whether a permanent total disability award was appropriate. The petitioner who is not obviously unemployable ordinarily must establish his inability to return to gainful employment, *i.e.*, by either diligent but unsuccessful attempts to find work, or, based on age, experience, training and education, his inability to perform any but the most unproductive tasks. (*Interlake, Inc. v. Industrial Comm'n* (1981), 86 Ill. 2d 168, 427 N.E.2d 103.) The petitioner, in addition to proving that he sustained permanent medical disability due to a work-related accident, must also

prove the extent to which disability impaired his earning capacity or ability to work. *E. R. Moore Co. v. Industrial Comm'n* (1978), 71 Ill. 2d 353, 376 N.E.2d 206.

■ Here the only expert testimony regarding total permanency was that of Dr. Massie indicating that the petitioner was totally and permanently disabled. And here the Company refused the petitioner's request for light work. He was unable to resume his supervisory position with the Company. His disabling coronary artery disease persisted. We thus find no reason to disturb the Commission's finding on remand that the petitioner was permanently and totally incapable of work after August 27, 1977.

The original findings of the Commission were appropriately set aside by the circuit court as being against the manifest weight of evidence. The subsequent awards of the Commission for other injuries claimed by the petitioner were improvidently granted. Accordingly, the January 14, 1987, judgment of the circuit court of Macoupin County is affirmed.

Affirmed.

WOODWARD and CALVO, JJ., concur.

JUSTICE McCULLOUGH, dissenting:

Initially, I disagree with two statements made by the majority in its disposition. They are:

(1) "It is obvious that the arbitrator reviewed the expert testimony. That the Commission considered the entire record is not equally obvious." 176 Ill. App. 3d at 327.

(2) "[W]e find that the Commission erred in adopting the disposition of Dr. Scherlis, which was inconclusive on the crucial issue of 'aggravation.' " 176 Ill. App. 3d at 330.

As pointed out, the Commission resolves factual disputes, draws reasonable inferences and conclusions from the evidence, determines causal connection, decides which conflicting medical view to accept, and determines whether an injury aggravated a preexisting condition. Equally important is the rule that this court will not reverse those determinations, unless they are contrary to the manifest weight of the evidence.

Initially, the arbitrator found no causal connection nor any permanent disability. The Industrial Commission affirmed the decision of the arbitrator and the circuit court reversed.

With respect to the quoted statements in the majority disposi-

tion, although the question is whether the petitioner's experience of August 22, 1977, aggravated his coronary disease, the issue is whether the decision of the Industrial Commission is against the manifest weight of the evidence.

The supreme court has made it clear:

> "It is fundamental that it is primarily the function of the Industrial Commission to resolve disputed questions of fact, including those of causal connection, to draw permissible inferences and to decide which of conflicting medical views is to be accepted. [Citations.] We recently declared that 'The concern of a court of review in Industrial Commission cases such as these is not to determine medical questions, on which, it appears, men of learning in that field disagree, but rather to pass on the legal question presented, *viz.*, are the findings of the Industrial Commission contrary to the manifest weight of the evidence before it.'" *Proctor Community Hospital v. Industrial Comm'n* (1969), 41 Ill. 2d 537, 541, 244 N.E.2d 155, 158.

We need only look to the evidence presented by the experts to determine whether the decision of the Industrial Commission was against the manifest weight of the evidence. As pointed out in the majority disposition, Dr. Scherlis, a certified cardiologist, testified that the external trauma of August 22, 1977, neither caused nor worsened the petitioner's disease. He further was of the opinion that there was no causal connection between the accident and the subsequent occurrences with the petitioner's heart, as no medical evidence indicated that the petitioner's coronary condition was attributable to or worsened by the accident. Dr. Scherlis also answered that the underlying condition of arteriosclerosis was not made worse by the accident of August 22, 1977.

Dr. Massie testified the electrocardiograms made in September of 1977 and October of 1977 were the same as the electrocardiograms made in 1975. The medical records show no complaints or findings indicating any cardiac involvement on the dates August 23, 1977, and August 24, 1977.

In his testimony Dr. Scherlis stated:

> "[T]here is no causal relationship between the accident and subsequent events with regard to his heart.
>
> Q. *** [W]as the underlying condition of arteriosclerosis made worse by that accident of August 22, 1977.
>
> A. No, it was not."
>
> "[T]o make a diagnosis of trauma to the heart you have to

demonstrate evidence of damage to the heart. And in this case there was no evidence of damage to the heart."

The majority gives importance to the evidence that Dr. Scherlis never personally examined the petitioner. This is not a reason to discount his testimony. Medical experts are competent to testify based upon medical records, their own studies, and experience, especially in the field of heart disease, without personal examination of the subject. This is simply a field of expertise where consultants are commonly used, their evidence submitted, with the Commission determining credibility and weight to be given the testimony.

The majority devotes much verbiage to discount the testimony of Dr. Scherlis. Although the issue of credibility is not ours to decide, Dr. Scherlis was a credible witness. The determination that he was needlessly evasive upon the issue of whether trauma aggravated the petitioner's coronary condition is exactly the burden that is required of the Industrial Commission. This court is making a credibility finding. Whether Dr. Scherlis was needlessly evasive, whether he considered himself an advocate of the truth, whether he deliberately refused to substantiate his disagreement with Dr. Massie are simply credibility questions to be determined by the Industrial Commission, not by a reviewing court. The Commission has performed its duty.

The decision of the circuit court should be reversed; the Industrial Commission decision, No. 84—IIC—278, should be reinstated.

McNAMARA, J., joins in this dissent.